[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
William A. Lichtenfels
Amy Horowitz.
Memorandum of Decision
Wilburn M., a/k/a, was born at Saint Francis Hospital, Hartford, on November 1, 1991. The mother of the child is Sharon M., d/o/b November 1, 1966. Co-terminus petitions were filed by the Commissioner of the Department of Children and Youth Services (DCYS) on January 10, 1992 pursuant to General Statutes Section 17a-112.[1]
CT Page 7624
The neglect/uncared for petition alleges that the child has been abandoned, has been denied proper care and attention physically and emotionally, and is homeless.[2] The termination petition alleges the statutory grounds of abandonment, acts of commission or omission, and no ongoing parent-child relationship. General Statutes Section 17a-112
(b)(1), (3), and (4). The petitioner is requesting a waiver of the one year requirement pursuant to Section 17a-112(c).
Notice And Jurisdiction
Both petitions identify the parent of this child as Sharon M., 36 Delmont Street, East Hartford. The returns of service annexed to both petitions show in-hand service on the respondent/mother, Sharon M.[3] The in-hand service of the co-terminus petitions was confirmed by the court at the plea hearing on February 6, 1992, and on the continuance date of February 27, 1992.
The court hereby finds that services of these petitions was effected in accordance with the requirements of law. General Statutes Sections 17a-112(e) and 45a-716. It is further found that this court has jurisdiction to hear and adjudicate the co-terminus petitions. General Statutes Sections17a-112(e), 46b-129, and 45a-717.
Procedure Relative To Co-Terminus Petitions
Where neglect and termination petitions are co-terminously filed under Section 17a-112(e) of the General Statutes, the court is required to proceed in three separate stages.
(1) Adjudication of The Neglect Petition
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since they are predicated on the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition is to be deferred until a decision is rendered on the termination petition.
(2) Adjudication of the Termination Petition
The court must next determine whether the proof provides clear and convincing evidence that any pleaded ground exists to terminate the parents' rights, as of the date of filing (or last amendment). If no such ground for termination is found, CT Page 7625 the court must proceed on the neglect petition and consider an appropriate disposition. However, if at least one alleged ground to terminate is found, the court must move on to the third stage.
(3) Disposition On both Of The Petitions
If grounds have been found to adjudicate the child neglected or uncared for, and to terminate parental rights, applying the respective standards of proof, the court must then consider whether the facts as of the last day of trial establish by clear and convincing evidence, after consideration of the six factors enumerated in General Statutes Section 17a-112(d), that termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating parental rights, it must return to, and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order should enter terminating parental rights.
Standards of Proof
A fair preponderance of the evidence standard of proof is the proper standard in neglect proceedings. In re Juvenile Appeal (84-AB), 192 Conn. 254, 264 (1984).
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its right and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child or the religious affiliation of the child." General Statutes 45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972); In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979). The integrity of the family unit is protected by the Ninth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. Stanley v. Illinois, supra. "The right to family integrity includes `the most essential and basic aspect of familial privacy the right of the family to remain together without the coercive interferences of the awesome power of the state.'" Duchesne v. Sugarman, 566 F.2d 817 824 (2d. Cir. 1977); In Re Juvenile Appeal (83-CD), 189 (Conn. 276 1983). Both the child and the parent(s) have constitutionally CT Page 7626 protected interests in the integrity of the family. Santosky v. Kramer, 455 U.S. 75 (1982). And, the "rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions." See: In Re Juvenile Appeal, 187 Conn. 431, 435 (1982).
The constitutional guarantee of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing" evidence, not merely a fair preponderance. Santosky v. Kramer, supra. Thus, the standard of proof as mandated by Conn. General Statutes Section 17a-112(b) and Prac. Bk. Section 1049 is "clear and convincing" evidence. See; e.g. In Re Juvenile Appeal (84-3),1 Conn. App. 463 (1984).
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In Re Juvenile Appeal (84-AB), supra at p. 262; In Re Nicolina T. 9 Conn. App. 598,602 (1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, may inquiry be made regarding the ultimate best interests of the child. Id. However, since Section 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, one ground only need be established for the granting of the petition. In Re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (1984); In Re Nicolina T., supra.
Factual Findings
The evidence and documentation before the court established the following facts.[4] Wilburn M., a/k/a, d/o/b November 1, 1991, is the seventh child born of Sharon M.; the mother was born November 1, 1966, reportedly one of thirty-one paternal siblings born to one father and six or more mothers. Sharon M. was born in Hartford, attended New Britain and Weaver High Schools, having left school in the ninth grade;[5]
respondent/mother has never been married. Except for possibly two very brief periods, it appears that the mother has never been employed.[6] None of Sharon M.'s seven children reside with her, all having been removed from her care by one or another form of legal proceeding; Wilburn M. has been in foster placement since December 20, 1991 pursuant to a ninety-six hour hold imposed by DCYS and the issuance of an OTC by this court. Both the evidence and the official court file disclose that Sharon M. has a long history of cocaine abuse and, although having previously participated in programs of in-patient and out-patient therapy, the mother has repeatedly reverted to drug use. CT Page 7627
The voluminous court file reveals the details of the proceedings involving all of Sharon M.'s other six children. The first four children born to respondent/mother were the following Jamaal W., d/o/b April 17, 1983; Joshua W., d/o/b February 12, 1985; Joseph W., d/o/b January 28, 1986; and Lionel J. Jr., d/o/b September 12, 1987. Very early on, the legal guardianship of the second child, Joshua W., was transferred through the Probate Court to the maternal grandmother, Virginia M., of New Britain; the court file fairly reflects that Virginia M. has not been available as a resource for any of the remainder of Sharon M.'s children.
Jamaal W. is a multihandicapped child; he is (and has been) blind, hearing impaired, and mentally retarded. The child cannot walk and is unable to communicate verbally. Joseph W. is a failure to thrive and severely, developmentally delayed child; Lionel J., Jr. was also diagnosed as a severely, developmentally delayed child. Respondent/mother admits to having begun her long continuing use of cocaine around the birth of the third child (Joseph W., d/o/b 1/28/86). Jamaal W. was voluntarily placed by respondent/mother in late 1986, and remained in foster care for approximately one year to October 16, 1987; while in the foster home, he regularly attended a specialized school program at Mountain Laurel in Hartford. In October 1987, Sharon M. removed the children from the DCYS foster home and arrangements were made whereby the child would continue to attend Mountain Laurel, the mother simply having to ready the child for the school bus which each morning would pick Jamaal up at his residence; despite these arrangements, the child, from October 1987, attended only six days of classes at Mountain Laurel while in his mother's care through May 1988.
During the 1987/88 period, the three children (Jamaal W., Joseph W. and Lionel J., Jr.) were in their mother's care. Apparently, the family resided at one point in time on Garden Street, and thereafter on Ann Street. On or about March 2, 1988, DCYS received a referral that the three children had been left alone for a period up to eight hours; respondent's explanation was that she had left the children with a boyfriend, who had left them alone. Again, on or about May 10, 1988, DCYS was contacted by the Hartford Police Department when respondent/mother left the children with Ms. Shirley G. and did not return; Mrs. G. reported to the authorities that she was unable to care for the three children.[7] On or about July 25, 1988, the Hartford police received a third complaint (apparently from respondent/mother's Ann Street landlord) that the children were alone in the apartment, and were crying continuously. As stated, Jamaal W., the oldest (then, age five,) was severely vision impaired, hearing impaired, non-verbal, mentally retarded, CT Page 7628 and could not stand or walk, and, the other two children had serious developmental delays. DCYS was contacted, and at the apartment, the children were found alone, crying, and extremely frightened. Two of the boys had on soiled diapers and all three boys were very dirty; a small amount of spoiled food was found in the apartment.[8] As a result of the third incident, an OTC was obtained, neglect petitions were filed, and the three children were placed, and remained, in foster homes. On January 19, 1989, all three were adjudicated and committed to DCYS for eighteen months, which commitments were extended on May 18, 1990 (effective July 19, 1990); termination petitions were filed April 20, 1990. On or about May 23, 1990, respondent/mother consented, in writing, to the termination of her parental rights to the child Jamaal W.; on March 1, 1991, Sharon M.'s parental rights to the two children, Joseph W. and Lionel J., Jr. were terminated by judgment(s) of this court. All three children are now in adoptive homes.
During the summer of 1988, shortly after the Ann Street incident and the placement of the three children, Sharon M. went with Durvin D. to live in New York City.[9] On April 26, 1989, respondent/mother's fifth child, Durvin D., Jr., was delivered at Roosevelt Hospital. At that time, mother was reported as homeless and temporarily staying at the Crown Hotel in Manhattan. Respondent/mother appears to have resided continuously in New York City with Mr. D. and his mother, in the latter's West Side apartment, until December 1989. Thereafter, she returned to Hartford, and on May 14, 1990, Sharon M.'s sixth child, Devon M., was born at St. Francis Hospital. Prior to respondent/mother's return from New York, a court in that jurisdiction, on or about October 17, 1989, granted full custody of Durvin D., Jr. to the paternal grandmother and ordered no visitation by mother unless approved by the court[10] When Sharon M. returned form New York, it appears that she lived with her father in East Hartford, at least on and off. She stated to a clinical psychologist that at some point after her return to Connecticut, and the birth of Devon, the paternal grandmother returned Durvin D. Jr., to her; in any event, on July 20, 1990, Sharon M. was living in Hartford/East Hartford with her remaining two children: Durvin D. Jr. and Devon M. On or about that date (7/20/90), the Hartford Police were notified by a Kathleen W., of Hartford, that Sharon M., on the previous evening, had brought the two children (ages two months and fourteen months) to her home, requesting that Ms. W. watch the children for about an hour. Ms. W. informed the mother that she could not care for the children, even for that brief time, due to a serious leg injury; however, respondent/mother just left, leaving the two children behind, and when she had not returned, some twenty-four hours later, Ms. W. contacted the police. DCYS was contacted and invoked a ninety-six hour hold; Durvin was placed with the maternal CT Page 7629 grandfather, Mr. Harvey W., of East Hartford. Devon was transported to St. Francis Hospital as it was reported he appeared to have "spasms in which his eyes rolled back in his head", and the child was admitted with a low grade fever and dehydration: on July 23, 1990, Devon M. was discharged from St. Francis and also placed with the maternal grandfather. On July 24, 1990, the DCYS worker was told by the step-grandmother that Sharon M. and the two children would have to reside elsewhere as the arrangement was causing too much stress in the home of the maternal grandfather and step-grandmother. Thus, on July 26, 1990, OTC's were obtained and co-terminus petitions were filed; both boys were placed in foster care. On January 10, 1991, following evidence (on the co-terminus petitions), Durvin D. Jr. and Devon M. were adjudicated neglected as to respondent/mother (denied proper care and attention due to mother's drug use and violation of New York custody order) and uncared for as to father (in that children were homeless)[11]
on disposition, the custody-guardianship of the two children was ordered transferred to the paternal grandmother, Ruth Lynn D.[12]
On January 25, 1991, the DCYS social worker brought Durvin D., Jr. and Devon M. to New York City to reside with their legal guardian, Ruth Lynn D., the paternal grandmother.
On November 1, 1991, Sharon M. gave birth to her seventh child, Wilburn M. On October 24, 1991, Sharon M. had been admitted to St. Francis Hospital with pre-term labor pains, poor fetal growth and a ruptured membrane; she stated she had last used cocaine four days prior to admission, she was described "minimally compliant" with prenatal care, and, upon testing, her urine tox screen was positive for cocaine. She voluntarily left the hospital, against medical advice, on October 28, 1991. Wilburn M., born 11/1/91, was delivered at thirty-two weeks gestation, and was placed in the neonatal intensive care unit with respiratory distress; when the child was born he tested negative for cocaine. At birth, Wilburn, delivered by C-Section, weighed approximately three and one-half pounds; the premature child was placed on CPAP for respiratory distress, on antibiotics for Sepis, had jaundice and occasional Apnea spells, and periodic breathing. Sharon M. was discharged from the hospital on November 5, 1991. Because of his prematurity, and the complications incidental thereto, Wilburn M. was not discharged until December 10, 1991. Between November 5 and November 11, 1991, respondent/mother visited the baby regularly; however, as of November 25, 1991, the mother had not visited the child for approximately fourteen consecutive days. Prior to the child's discharge from the hospital, DCYS, on or about December 2, 1991, undertook, unsuccessfully, to obtain an OTC based on Sharon M.'s past parenting record, the child's needs given the premature birth, mother's lack of interest, her history and admissions regarding cocaine use, etc.; hospital and DCYS personnel felt that the CT Page 7630 "conditions and circumstances surrounding the care of this child requir[ed] that custody be immediately assumed to safeguard [his] welfare" and that the child would be "at significant risk for neglect if discharged to [his] mother." However, not having obtained the OTC (absent any showing of immediate risk of physical danger), a neglect petition was filed, but Wilburn M. was discharged from the hospital to reside with respondent/mother at the East Hartford home of the maternal grandfather and step-grandmother. Thereafter, Sharon M. resided on and off with her father and step-mother, and left Wilburn in their care. On December 20, 1991, DCYS was back before the court again requesting an OTC, the social worker stating in affidavit form. "Mother has left child in care of relatives who can no longer care for the child and mother's whereabouts are unknown at present. [m]other is known cocaine abuser and stated to relatives on 12/18/91 that she passed out from alcohol abuse."[13]
The OTC was granted by this court upon a finding from the documentation presented that the "child [was] left by parent w/step-grandmother who requested that child be removed from her home as she cannot care for child."[14] According to the Termination Study, admitted into evidence through the social worker, the step-grandmother, on December 18, 1991, had great concerns regarding Sharon M.'s ongoing drug use, and made it very clear to the worker that the family could not care for the infant and, therefore, asked to have Wilburn placed; the family indicated they did not know Sharon M.'s present whereabouts. On December 19, 1991, DCYS invoked a ninety-six hour hold on Wilburn M. and the child was placed in foster care where he has remained pursuant to the OTC granted on December 20, 1991. There is no father listed on Wilburn M.'s birth certificate.
As stated Wilburn M. was discharged from St. Francis Hospital on December 10, 1991; the hospital made an immediate referral to the VNA, East Hartford for "post partum care and newborn management."[15] The visiting nurse went to the grandfather's East Hartford home on December 11, 1991, met the respondent/mother, and observed the baby in her presence; respondent/mother was informed of the hospital's concerns, expressed wonderment at why VNA was involved, agreed to the VNA visits, and signed all the necessary forms. The VNA visits were scheduled with respondent/mother, but when the nurse went to the home, the mother was not there; similarly, when VNA telephoned the East Hartford home, there was no answer. On December 19, 1991, the visiting nurse spoke to respondent/mother's brother who stated that Sharon was not at home, that she had not been home for approximately one week, that she had left the baby there and family members were "forced" to take care of the newborn, and that the family could not continue to take care of the child.[16]
The nurse left her telephone number for the mother to call when, and if, she returned, but no call or phone message from Sharon M. CT Page 7631 was ever received by the VNA. The VNA had offered Sharon M. nursing services for herself and the child, was prepared to provide her with instruction on parenting skills and child care, would provide the mother with assistance in keeping medical appointments, and had intended to help Sharon M. in connecting with, and participating in, an appropriate out-patient drug treatment program. Since all efforts to contact and locate Sharon M. after 12/11/91 failed, appropriate (and necessary) services could not be put in place and, accordingly, the VNA, on December 26, 1991, closed the case, with prior notification to DCYS, because of the lack of cooperation on the part of the mother.
The referral from the VNA, for non-cooperation with nursing services, brought about the actions of DCYS which resulted in the obtaining of the December 20, 1991 OTC, and the placing of Wilburn M. in foster placement. On December 23, 1991, Sharon M. telephoned DCYS and an appointment was scheduled for the mother to meet with the social worker; however, on the scheduled date, the mother did not appear. Since December 23, 1991 to date of trial, respondent/mother has made no inquiries of DCYS regarding the child, either telephonically, in writing, or otherwise. As of the date of trial the agency had not heard from Sharon M. and has no current address or phone number for her. Respondent/mother has made no request of either DCYS or the foster parent to visit the child.
Wilburn M. continues in foster placement with the same family with which he was placed on December 20, 1991; the foster mother and the DCYS worker report that Wilburn is doing quite well. Permanency through the adoption process continues to be the DCYS plan for Wilburn M. if the agency prevails on the co-terminus petitions.
Adjudication: Neglect/Uncared For Petition
Petitioner is required to prove by a fair preponderance of the evidence that Wilburn M., a/k/a, as of the date of the filing of the petitions, was a neglected child in that he was denied proper care and attention physically and emotionally; or, that the child was abandoned; or, that Wilburn M., a/k/a, was an uncared for child in that said child was homeless.
The court finds that petitioner has proved, by a fair preponderance of the evidence, that Wilburn M. was, as of the date of filing, a neglected and uncared for child as pleaded. When the child was discharged from St. Francis, hospital professionals understandably were concerned over the child's welfare and felt the baby would be at risk in the mother's care. CT Page 7632 Respondent/mother had not visited the child for some fourteen straight days, she had a long history of cocaine addiction and rejected as unnecessary recommendations for immediate drug therapy, she had tested positive for cocaine a few days before the birth of this child, other of her children had been born cocaine positive, and none of her other six children were in the mother's care and custody. Therefore, hospital staff made the referral to VNA to address the medical needs of the child, and to assure appropriate monitoring and the development of adequate parenting skills. Respondent/mother did not cooperate with VNA at all, left the child for a protracted period with family members who could not care for the newborn, and followed through on none of the VNA services which the hospital felt were necessary for the proper care of Wilburn M. In the court's view, the evidence also fairly established that the infant was effectively abandoned by the respondent/mother (even in the common law sense of abandonment). Wilburn M. was born November 1, 1991; respondent/mother was discharged on November 5, 1991, and visited the baby to December 11; however, as the evidence stands, she did not visit thereafter for some fourteen straight days which was one factor that prompted the initial application for an OTC (prior to the child's discharge). The mother did indicate to hospital staff that she wished to keep the baby, and upon the child's discharge, she took Wilburn M. to her father's East Hartford home; but, the evidence fairly establishes that Sharon M. promptly left the child with her family, that the family could not continue to care for the infant, and that she apparently left no address, phone number, etc., where anyone could contact or locate her. Thus, on the evidence, Sharon M. demonstrated no real or sustained intent to continue caring for Wilburn M., or to participate in the raising, nurturing, and maintaining of this child. Also, the evidence substantiated the allegation that Wilburn M. is an uncared for child in that he was homeless: as stated heretofore, respondent/mother left the child with family members who, as of the time of the second application for an OTC, stated they could not care for the infant.
The court finds that Wilburn M. is a neglected child in that he was denied proper care and attention physically and emotionally, and, said child was abandoned. Additionally, the court finds that Wilburn M. is an uncared for child in that said child was homeless.
Adjudication Termination of Parental Rights
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged ground has been established by clear and convincing evidence. As stated previously, the "clear and convincing" CT Page 7633 burden of proof is constitutionally mandated. Santosky v. Kramer, supra. This evidentiary requirement necessitates a standard of proof that is between the standard required in an ordinary civil action and that required to find guilt; there must be "more than average certainty on the part of the fact finder." In Re Juvenile Appeal (84-3), 189 Conn. 276, 297 (1983); Dacey v. Connecticut Bar Assn., 170 Conn. 520, 536-37 (1976); In Re Juvenile Appeal, 1 Conn. App. 463, 467-68 (1984). The TPR petition in the instant case was co-terminously filed on January 10, 1992.
a) Respondent/Mother: Abandonment
Here, as stated, Sharon M. ceased visitation with the child over fourteen days before his discharge from St. Francis Hospital, and, when the infant was discharged to the mother, she almost immediately turned his care over to family members, left the family home, and did not inform family members of where she was or how she could be reached. The mother's family could not care for Wilburn M., and, the respondent/mother made virtually no effort to cooperate with VNA in developing parenting skills necessary for her proper care of the infant.
General Statutes Section 17-112(b)(1) reads: "The superior court upon notice and hearing may grant. . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . ."
It is the court's view, on the evidence, that Sharon M. has not maintained a reasonable degree of interest, concern, or responsibility regarding the well-being of Wilburn M. Unlike the common-law principle of abandonment applicable under the neglect provision of General Statutes Section 46b-120, the standard respecting statutory abandonment under Section17a-112(b)(1) is "not whether the parents have shown some interest in their children"; rather "[c]ommon sense dictates that the parent's obligations toward . . [a] child go further than a minimal interest." (Emphasis in original). In re Rayne M.,13 Conn. App. 23, 37 (1987).
The court hereby finds, applying a clear and convincing standard of proof, that petitioner has established abandonment as a statutory ground for the termination of the parental rights of Sharon M. to the child, Wilburn M. CT Page 7634
b) Respondent/Mother Acts Of Commission And Omission
Sharon M. has left the infant, Wilburn M., with the maternal grandfather and step-grandmother who are unable to care for the child. The child was denied proper care and attention physically by the respondent/mother's failure to cooperate with the VNA in the services which the hospital staff felt were necessary following the discharge of the premature baby.
General Statutes Section 17a-112(b)(3) provides, as follows: "The superior court upon hearing and notice . . . may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interest of the child and that . . . with respect to a nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being."
Here, respondent/mother's acts of omission deprived the child of the care necessary for his physical well-being. The court finds, applying a clear and convincing standard, that petitioner has presented sufficient evidence to establish that Wilburn M. was denied, by reason of acts of parental commission or omission, the care necessary for his physical well-being.
c) Respondent/Mother: No Ongoing Parent-Child Relationship
Wilburn M. was born November 1, 1991; upon the mother's discharge (11/5/91), she visited the child regularly to November 11, 1991, ceasing visitation on that date. The child was discharged to the mother's care on December 10, 1991. On December 19, it was reported to VNA that respondent had left the child with the family, and had not been home, or called home, for one week. On December 20, DCYS obtained the OTC. Thus, respondent/mother had less than a two weeks, total, in which to develop any relationship or bonding between herself and the infant.
General Statutes Section 17a-112(b)(4) provides, as follows: "The superior court upon hearing and notice . . . may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to a nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, CT Page 7635 moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child." The absence of a parent-child relationship involves a situation where the child has never known his parent so that no relationship ever developed, or where the child has clearly lost that relationship so that despite its existence, it now has been completely displaced; our Supreme Court has stated "`[i]n either case the ultimate question is whether the child has no present memories or feelings for the natural parent.'" In re Juvenile Appeal (Anonymous), 181 Conn. 638,645-46 (1980); In re Shannon S., 41 Conn. Sup. 145, 158 (1989).
Considering the age of this child, and the very limited contact the respondent/mother has had with him, it is apparent that the infant has no memories of the mother and that there exists no ongoing parent-child relationship, that is, the type of relationship or bonding which would ordinarily develop as a result of a parent having met on a day to day basis the physical and emotional needs of the child.
Sharon M. has demonstrated no sustained interest in, or responsibility for, the day to day care and nurturing of this infant. To permit the passage of additional time, in the circumstances of this case, premised on the unlikely prospect that the mother might make major adjustments in her life, and undertake to appropriately meet the day to day needs of this child, would be, in the court's view, disregarding the best interests of the child which are served by securing a permanent stable, nurturing and caring home. The court finds, by clear and convincing evidence, that there is no ongoing parent-child relationship between respondent/mother and Wilburn M., which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of this child.
Statutory One Year Requirement
Section 17a-112b permits the court to terminate parental rights upon clear and convincing proof of one or more of the four grounds set forth therein, provided, that the termination is in the best interests of the child, and, that the circumstances constituting the ground for termination have existed "over an extended period of time, which, except as provided in subsection (c) . . . shall not be less than one year." Subsection (c) permits the court to waive the one year requirement if, from the totality of the circumstances CT Page 7636 surrounding the child, a waiver is necessary to promote the best interests of the child.
Sharon M. has a long history with DCYS; all of her other six children have been removed from her care, and her parental rights to three of those children have been terminated. She has a long history of cocaine abuse, has been in treatment and promptly then reverted to drug use, and while in the hospital in connection with the birth of Wilburn, she saw no need for future participation in drug therapy (even though she had tested positive for cocaine a few days before giving birth). Respondent/mother has, as stated, shown no sustained interest in caring for, or raising Wilburn M. she did not visit the newborn for some fourteen days straight; when the child was discharged from the hospital, she almost immediately left him in the care of others (as she had done in the past with certain of her older children), and she would not cooperate with the VNA in undertaking to learn basic parenting skills necessary for the proper care of the child. Respondent/mother left the child, leaving no information as to where she was going, or in what manner she could be reached. In substance, nothing appears to have changed (or improved) over the course of Sharon M.'s several years of DCYS involvement. She continues to absent herself from her children, remains uncooperative with DCYS and support services provided, and places her own cravings and interests above the basic care needs of the children.
Wilburn M., on the other hand, should not remain for a prolonged period in the uncertain environment of foster placement. Considering respondent/mother's long history with DCYS, the obvious absence of improvement in terms of her capacity to properly parent, and care for, a child, her many years of cocaine addiction, and her displayed lack of any sustained interest in caring for this child, it is the court's view that the best interests of Wilburn M. would not be served by deferring termination of parental rights for the one year statutory period. Wilburn M. is adoptable; he deserves a loving, permanent, nurturing, safe, wholesome, secure home.
Petitioner has established, by clear and convincing evidence, that from the totality of the circumstances surrounding this child, a waiver of the one-year requirement contained in Section 17a-112(b) is necessary to promote the best interests of the child.
Disposition
Aside from the issue of waiver of the one-year requirement discussed in the preceding section of this opinion, Section 17a-112(b) provides that the court may grant a petition CT Page 7637 to terminate only when it finds, on the basis of clear and convincing proof, that to terminate parental rights would be in the best interests of the child. And, prior to a determination on disposition, the court is statutorily required to consider the six factors set forth in General Statutes Section 17a-112(d). The last date on which evidence was received on these petitions was April 16, 1992.
As stated heretofore, the evidence, in my view, establishes, clearly and convincingly, that it is in the best interest of Wilburn M. to terminate respondent/mother's parental rights, thereby freeing this child for adoption. Since the December foster placement of Wilburn M., respondent/mother, to date of trial, has not visited the child, has not requested visitation, has not even telephoned or otherwise communicated with DCYS (other than the phone call on 12/23/91) regarding the child, and has sent no mail, cards, presents, etc. to, or for, the child. The Department has not received an address for Sharon M., and during most of the time, has been unable to locate respondent/mother. Sharon M. did not appear for trial on April 16, 1991, although a letter was mailed by the Clerk to the East Hartford address advising her of the trial date (which letter was never returned); on April 16, respondent/mother's attorney advised that he had been unable to locate her. Respondent/mother did not appear at any of the court proceedings regarding Wilburn M. On April 16, 1991, upon completion of the petitioner's evidence, the court held the matter open for presentation of evidence by respondent, and instructed mother's attorney to undertake further efforts to locate Sharon M. and to report to the court (as a docket matter) on April 30, 1991; the attorney reported that he had again been unable to locate Sharon M., and that a letter he sent to her at the East Hartford address (on 4/23/92) was neither returned nor responded to.[17] Therefore, on the totality of the circumstances up to, and through, the time of trial, Sharon M. continues to demonstrate virtually no interest in the welfare, care, maintenance, and raising of Wilburn M. As stated, the best interests of this child, in the court's view, are best served by freeing the child for adoption, and the provision of a permanent, loving, nurturing, stable home.
The court has considered, carefully, the factors enumerated in Section 17a-112(d)(1) through (6), and hereby finds (applying a clear and convincing standard), the following:
(1) Timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.
Respondent/mother has not communicated with DCYS or kept the agency informed of her whereabouts. The Department has CT Page 7638 been unable to locate Sharon M. Thus, it was not possible to put, or maintain, services in place and DCYS efforts toward effectuating a reunification (visitation, drug therapy, etc.) were effectively thwarted by the mother's lack of cooperation.
(2) Terms of any applicable court order entered into and agreed upon by an individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
No court orders or expectations placing obligations on respondent/mother were entered in these proceedings, primarily because Sharon M. failed to appear at the scheduled court hearings.
(3) Feelings and emotional ties of child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Considering the young age of the child, the fact that the child has never been in the mother's care for any extended period, and the mother's extremely minimal visitation (while child was in hospital), feelings or emotional ties on the part of the child toward Sharon M. are unlikely. The evidence indicated that this very young child is doing well in the foster home; however, there was no evidence as to bonding, or the extent of any bonding, between the child and the foster parent(s).
(4) The age of the child
Wilburn M. was born November 1, 1991; he is approaching ten months of age. In view of the child's age, he is certainly adoptable; in view of the mother's lack of contact with, and disinterest in, the child, termination is in the best interest of Wilburn M.
(5) The efforts the parent has made to adjust her circumstances, conduct and conditions to make it in the best interests of the child to return to her home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions and (B) maintenance of regular contact or communication with the guardian or other custodian of the child.
Sharon M. has not maintained contact, or had continuing communications, with DCYS concerning the child, or the CT Page 7639 eventual return of Wilburn M. to her care. There has been presented no evidence of any significant efforts on the part of respondent/mother to adjust her circumstances, conduct and conditions to provide a home to which the child, in his best interests, could return in the foreseeable future. Respondent/mother has had minimal visitation with Wilburn M., and has maintained no regular contact with the child, or with DCYS, for the purpose of working towards reunification. She has had no contact or communication with the foster parent, guardian, or other custodian of Wilburn M.
(6) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
There was no evidence presented that respondent/mother had been prevented in any way, or by any one, or by any circumstance, from developing and/or maintaining a meaningful relationship with the child. Sharon M. neither cooperated with the Department, nor followed through on any steps toward developing and/or maintaining any relationship with this infant child.
Petitioner has met its burden of proof by clear and convincing evidence; the best interest of Wilburn M. will be served by freeing the child for adoption, and by provision of a safe, stable, loving, secure, permanent home.
The petition to terminate the parental rights of Sharon M. to her child, Wilburn M., a/k/a, is hereby Granted; and the Department of Children and Youth Services is appointed Statutory Parent for the said Wilburn M.
In accordance with General Statutes Section17a-112(i), the case plan report shall be submitted to this court by the Commissioner within ninety (90) days, and thereafter as the court may require, but no less often than annually.
Mulcahy, J.